W. H. GIBBS, AUDITOR, ET AL., *v.* JOSHUA GREEN.

1. LIQUIDATING LEVEE LAW (ACTS 1866-67, p. 237).    *Contract within*
    *art.* 1, § 10, *Constitution of United States.*
   To liquidate the debts of a board of commissioners organized under a
       State statute for the purpose of building and repairing levees within
       a certain district, an act was passed, providing for the organization of
       a board of liquidating commissioners and the issuance of bonds by
       them, which levied a specific tax on the lands within the district to
       pay the bonds, and declared that it should continue until a sufficient
       sum was raised to pay all the debts.  Accepting the proposal contained
       in the act, the creditors surrendered their evidences of debt, which
       bore eight per cent interest and were overdue, remitted the accumu-
       lated interest of fifty per cent on their face, and received the bonds
       of the liquidating board, bearing five per cent interest, and payable
       in five equal annual instalments.  *Held*, that the act became a con-
       tract between the State and the liquidating commissioners on the
       one hand, and the holders of the bonds on the other, which neither
       party could thereafter materially modify without the other's consent.

2. SAME.    *Trust in forfeited tax lands.    Vested rights.*
   The same statute further provided that the tax levied to pay the bonds
       should be a lien upon the lands in the district, and that all lands sold
       for non-payment thereof should, in default of bidders, be struck off
       to the board, and, if not redeemed, be sold, and the proceeds applied to

pay the bonds.  *Held*, that the lands forfeited to the commissioners constituted a fund for the redemption of the bonds, which the legislature could not divert.

3. SAME.  *Fundamental changes.   Act of Feb.* 1, 1877 (*Acts* 1877, *p.* 22), *unconstitutional.*

No fundamental change in the statute which affects the validity of the security carved out for the bond-holders is permissible, nor is it competent for the legislature to repeal the tax levied by the act to pay the bonds.  *Semble*, that an act repealing the tax, and offering the bond-holders the alternative of surrendering their bonds and receiving new ones of one-third their face value, with a less tax to pay them, or not participating in the new tax, is unconstitutional.

4. SAME.  *Alterations in matters of detail.   Abatement Law, Acts* 1875, p. 11.   *Acts* 1876, p. 166.

As to mere matters of detail, the system can be changed by the legislature, and the presumption would always be in favor of the validity of the alteration.   Legislation which releases the forfeited land from a portion of the taxes due on it, but enhances the value of the bonds by making them receivable in the purchase and redemption of the land for taxes other than those for which they were originally receivable, will be upheld, at least so far as to protect titles acquired thereunder.   The bond-holders, not having objected, will be held to have accepted the enhancement in the value of the bonds as an equivalent for the abatement of the taxes due on the land purchased or redeemed.

5. JUDICIARY.  *Power to enforce public contracts.   Obstacles.*

Because the judiciary has neither the power nor machinery to levy and collect taxes, cases have arisen where, owing to their peculiar facts — as the non-existence of functionaries on whom the courts could act — it has been found impossible to enforce such obligations; but, when such persons or machinery can be found, performance will be compelled.

6. CHANCERY.  *Jurisdiction to administer public trust.   Statutory officers no obstacle.   Practice.*

The fact that the commissioners are vested by the act with power to sell the lands does not divest the Chancery Court of its inherent jurisdiction to administer the trust fund for the benefit of the *cestuis que trust*, on their application; and, in selling, the court may employ the statutory trustees or its commissioner, as it may deem most advantageous to all concerned.

7. SAME.  *Injunction.   Public officer.   Unconstitutional statute.*

Courts cannot examine a statute generally and declare it unconstitutional, nor can they enjoin an executive or ministerial officer generally from putting a law in force; but a suitor who calls on equity to

arrest the performance of a duty imposed by the legislature on a public officer, must show conclusively, not only that the act about to be performed is unconstitutional, but also that he will be directly injured thereby.

8. SAME.   *Case in judgment.*

A bond-holder, who does not wish to surrender his bonds and come in under the scaling act, cannot, by injunction, prevent others from taking its benefits, nor enjoin the commissioners from giving notice, receiving old bonds and delivering new ones in lieu of them, as directed by the act; but the collection of the old tax may perhaps be compelled by *mandamus*, at the suit of such bond-holder, or the liquidating commissioners be enjoined from giving the tax collectors acquittances in full, until they account for the full tax levied by the prior statute.

APPEAL from the Chancery Court of Hinds County.

Hon. E. G. PEYTON, Chancellor.

A statute was passed Dec. 2, 1858, entitled " An Act to aid in repairing and perfecting the levee of the Mississippi River in the counties of De Soto, Tunica, Coahoma, Bolivar, Washington and Issaquena " (Acts 1858, p. 33), by which a general scheme for protecting the alluvial lands of this State was organized, the local levee boards existing under prior laws in the counties of the district were suspended, and a general levee board created, which was required to assume their indebtedness.   To effectuate the scheme the board was authorized to issue scrip, not to aggregate over $500,000, nor to bear a greater interest than eight per cent per annum; a direct tax was levied on the lands in the district, its collection by the sheriffs of the counties suitably provided for, and its disbursement authorized in building and repairing the levees.   The tax was to be a lien on said lands, and the tax collector's deed to pass a perfect title.   In default of bidders, they were to be struck off to the levee treasurer, who was to hold them, and, if not redeemed, to sell, and apply the proceeds to paying debts contracted in building the levees.   State and county taxes were suspended on lands sold to the treasurer, and could be collected by him only on redemption or sale.   On Feb. 10, 1860 (Acts 1859–60, p. 432), an act was passed extending the period of taxation prescribed by the act aforesaid to April 1, 1865, providing for the liquidation of the debts of the general levee

board, and authorizing the board to substitute its scrip for the outstanding scrip of the counties in the district immediately fronting the river. During the late war the taxes levied by those acts were suspended. The suspending statutes declared, however, that the taxes should continue after the war for the period originally contemplated, and that persons availing of the suspension should pay interest at eight per cent per annum on the tax which would have been payable.

The general levée board ceased to exist during the war, and was not reorganized. Its debts, direct and indirect, under the act of 1858 and amendments, the interest on which was about fifty per cent of their face, amounted, in 1867, to $1,500,000. To provide for the payment of those debts, on Feb. 13, 1867, an act was passed (Acts 1866–67, p. 237), by which a uniform tax of five cents an acre in some counties of the district, and three cents an acre in the others, was levied and made payable on the 1st of May. This tax, it was stipulated, " shall continue until a sufficient sum is collected, with which to pay off all the debts and liabilities contracted or assumed, and all the script or evidences of debt issued by the general board of levee commissioners, organized under the act approved Dec. 2, 1858," and was declared to be a tax *in rem* upon the lands, which, in default of payment annually by the 1st of May, whether the owner had personalty or not, were subject to a sale, which was to vest in the purchaser a title valid against the claims of all persons. From the sheriffs of the counties within the district, bonds to collect and pay over the taxes were to be required, and the proceedings of sale, forfeiture and redemption were to be the same as those prescribed by the act of 1858. The governor was to appoint a board of three commissioners, to be styled the board of commissioners to liquidate outstanding liabilities, who, on their first meeting, on the first Monday in March, 1867, after organizing and electing a president, secretary and treasurer, were to make an order requiring all persons who had claims alleged to be due, the payment of which was provided for by the act, to present them to the secretary of the board on or before June 1, 1867, to have them registered; and all not so presented were to be excluded from the benefits of the act. The secretary was to register, in

books kept for the purpose, each claim presented, with the name of the person presenting it, and the person claiming to be its owner, and indorse on it the time at which presented. The board was to examine the claims, and mark them approved or disapproved; and the owners of claims approved were to be entitled to the benefits of the act.

The following conditions were, however, annexed to the acceptance of this statute. The creditor was to remit all interest which had accrued on his demand up to June 1, 1867, to surrender his claim to the board to be cancelled, and to accept in lieu thereof bonds to be issued by the board, payable in five equal annual instalments, bearing interest at the rate of five per cent per annum, from June 1, 1867, until paid, and, on receiving the bonds, was to supply the stamps required by the United States revenue laws.

The presentation of these bonds was suitably provided for, and the treasurer of the board, who received the money collected, was with it to pay them, as well as salaries and expenses. The board was to receive and sell all the property of the general levee board, applying the proceeds to liquidate the bonds. And the surplus funds were to be used to buy outstanding bonds. If at a sale no one should bid the amount of taxes, the land was to be struck off to the board, and, if not redeemed in the manner provided, sold, and its proceeds applied in paying the bonds. The land acquired thus, or from the general levee board, was to be exempt from taxation under State authority until redeemed or sold, except that one, redeeming land struck off to the board, should pay the State, county and levee taxes due thereon. After the payment of all the bonds, the money, lands and other property belonging to the board were to be applied to such uses as the legislature might direct.

The creditors of the general levee board, with few exceptions, surrendered their evidences of debt, and took the liquidating levee bonds. After all demands not presented had become barred by the terms of the statute, on May 13, 1871 (Acts 1871, p. 57), the legislature extended the time for presenting claims until the second Monday in November, 1871, provided that the bonds issued for those then presented should be designated " new series," and continued the tax, as well for the pay-

ment of the new series as the old. All unpaid bonds, whether due or not, were made receivable for levee taxes due or to become due under said acts; and the governor was authorized to appoint one commissioner, who succeeded to the powers, rights and privileges of the liquidating levee board, and was substituted in their stead.

The legislature, on March 1, 1875 (Acts 1875, p. 11), extended the benefits of a general abatement law to the three levee boards, of which the liquidating levee commissioner constituted one. This act, abating all taxes prior to 1874 (including levee taxes) upon lands held by tax sales or forfeitures by either of the three levee boards, made the land liable for the State, teachers' fund, county and levee taxes for that year, and provided for the collection of such taxes, the sale of the land for their non-payment, and for redemptions and purchases. The lands of the liquidating levee board acquired under the prior legislation were sold under this act, and, as directed by the act, in the absence of bidders, conveyed to the State.

An act entitled " An Act to abolish the office of liquidating levee commissioner, and to provide for the redemption of lands in the liquidating levee district, and for other purposes," became a law on April 11, 1876 (Acts 1876, p. 166). This act devolved the duties of the liquidating levee commissioner upon the auditor of public accounts and the treasurer of the State. It also provided that the forfeited lands might be purchased or redeemed with liquidating bonds (or their equivalent surplusage certificates), which were made receivable for State and county as well as levee taxes. Under this provision redemptions and purchases were made, without objection on the part of the bond-holders. The redemptions in certain counties, however, were subjected to the restriction of paying other taxes.

On Feb. 1, 1877 (Acts 1877, p. 22), " An Act to amend an act entitled an act to abolish the office of liquidating levee commissioner, and to provide for the redemption of lands in the liquidating levee district, and for other purposes, approved April 11, 1876," was passed. Sect. 1 extends the time for redemption under the act of April 11, 1876, to Nov. 1, 1877, provided that the taxes of 1877 shall be paid as other State

and county taxes. Sect. 2 is a provision to carry out the purpose of sect. 1. Sect. 3 divides commissions under this act between the auditor and treasurer. The act then continues : —

"SECT. 4. That, in lieu of the tax of five and three cents an acre, now levied and assessed upon the lands in the said liquidating levee district, there is hereby levied and assessed a uniform tax of two and one-half cents an acre per annum on each and every acre of land in the counties of Tunica, Coahoma, Bolivar, Washington, Issaquena, and that portion of Sharkey which was formerly included in the counties of Issaquena and Washington, and in such part of De Soto County as was included in the levee district formed by the act approved December 2, 1858; and a like tax of one and one-half cents per acre is hereby levied and assessed per annum on each and every acre of land lying in any other county included in said levee district, and on any other lands which were subject to taxation by virtue of the provisions of the act of December 2, 1858, aforesaid — which tax so levied and assessed shall be paid in legal currency of the United States, and collected and accounted for in the same manner and upon like conditions, as far as applicable, as is now prescribed by law for the collection of taxes for the State, and shall continue until a sufficient sum is collected with which to pay off all the interest and principal of the bonds hereinafter authorized to be issued: *Provided,* that any lands in said district exempted from the provisions thereof, by filing of affidavit or otherwise, shall be exempt from the provisions of this act.

"SECT. 5. That the tax levied and assessed in the preceding section be, and the same is hereby, declared to be a tax *in rem* upon the lands included therein, and intended to create a lien in all respects as secure and perfect as the existing lien for the tax for which this is substituted, and all acts or parts of acts relating thereto not inconsistent with this act be, and the same are hereby, re-enacted and made applicable to the tax herein levied and assessed."

Sect. 6 provides that all outstanding bonds or surplusage certificates issued under the provisions of the act of Feb. 13, 1867, " or under the provisions of any act or acts amendatory thereto, may be presented by the holder thereof to the auditor of public accounts, by him to be registered on or before the 1st day of June, 1877; and all such bonds or certificates which shall not be so presented for registration within said time shall be barred

by limitation, and shall not thereafter be receivable for taxes, except for the redemption and purchase of lands as provided in the act to which this act is amendatory, and in sect. 1 of this act amendatory thereto, nor constitute otherwise a valid claim against said levee district; and after said 1st day of June, 1877, no action in law or equity shall be maintained to enforce the same." Sect. 7 makes it the duty of the auditor to give notice of the passage of the act, and to register the bonds and certificates when presented, and indorse the same "registered," with his signature as *ex officio* levee commissioner, and date thereof.

"Sect. 8. That it shall be the duty of the State treasurer, upon the presentation to him, on or before June 1, 1877, of the bonds or certificates so registered and indorsed, to issue to the holder, or person presenting the same, bonds payable in eight years from June 1, 1877, bearing six per cent interest per annum, payable annually, with coupons of interest attached, the said bonds to be issued upon the basis of thirty-three and one-third per centum of the face and interest calculated up to June 1, 1877, of such registered bonds or certificates; and he shall keep a record of the new bonds so issued, in a book provided for the purpose, and in opposite columns, or in a separate book, if more convenient, record the numbers, amount, &c., of the old bonds or certificates taken up, which shall be marked 'cancelled,' with the signature of the treasurer, and filed away in his office: *Provided*, that, when so desired by the holder or owner of any of said old bonds or certificates so presented, the said treasurer shall consolidate the whole or any part thereof, as may be desired, into one or more of the new bonds hereby authorized to be issued."

Sect. 9 prescribes the style and denominations of the new bonds.

"Sect. 10. That, in order to entitle the holders of any of the present outstanding bonds or certificates of said liquidating levee district to the benefits of this act, they shall cause the same to be registered, as herein provided, and shall consent to surrender such bonds or certificates to be cancelled as aforesaid, and shall accept in lieu thereof bonds to be issued as hereinbefore provided, to be made payable out of the moneys accruing under the provisions of this act."

Sect. 11 repeals " all acts or parts of acts levying and assessing the taxes heretofore authorized of five and three cents an acre on lands in the aforesaid district ; " constitutes " the proceeds of the tax levied and assessed in section four of this act " " a special fund and trust, for the purpose : first, of paying the coupons of annual interest on the bonds provided for in this act; and, second, to create a sinking fund for the purchase or payment of the bonds ; " and provides in detail the method to be pursued in their purchase and payment. The remaining sections of the act contain provisions merely incidental to its main purposes. The last is, " That this act take effect and be in force from and after its passage, and all other acts prescribing other modes of payment of the indebtedness herein provided for be, and the same are hereby, repealed."

Joshua Green, the holder of $84,000 of the liquidating levee bonds, issued under the acts of 1867 and 1871, filed this bill in chancery in behalf of himself and the other bond-holders, against W. H. Gibbs, auditor of public accounts, and W. L. Hemingway, treasurer of the State, in the capacity of *ex officio* liquidating levee commissioners, and against the State of Mississippi, alleging that the act of 1867 having been accepted by the holders of claims against the general levee board, and the bonds having been issued under that act and the one of 1871, there was a contract which the State could not by subsequent legislation impair ; that the lands, which had been sold for the non-payment of the taxes to the liquidating levee board, were held in trust for the bond-holders ; that the abatement act of 1875, in so far as it was intended to deal with the lands and release back taxes, and the act of 1876, in so far as it imposed restrictions on the redemption of the lands, were unconstitutional and void ; and that the act of 1877 was a direct attempt to repudiate two-thirds of the debt, and was void *in toto*. The bill prayed that Gibbs and Hemingway, in their capacity as commissioners, be compelled to discover and set out by section, township and range the lands held by them as such commissioners in the several counties of the liquidating levee district; that the lands be decreed to be a trust fund, and sold to pay the complainant and such other bond-holders as should come in and aid in prosecuting

the suit; that they be compelled to collect the tax levied by the act of 1867, in the mode prescribed by law, notwithstanding the act of 1877, and to apply the same as directed by the act of 1867; or, in case of their failure, that a receiver be appointed to receive and disburse the tax; and for general relief. There was a further prayer for an injunction to restrain Gibbs and Hemingway from carrying out the acts of 1875, 1876, and 1877, so far as they relate to this land; and that, on final hearing, the statutes be declared unconstitutional, and the injunction made perpetual. Gibbs and Hemingway demurred to the bill, on the grounds, 1, That the acts attacked are constitutional; 2, that the acts under which the complainant's debt accrued are unconstitutional; 3, that the allegations do not warrant the relief prayed; 4, that the court has not jurisdiction; 5, want of equity on the face of the bill. And from a decree overruling their demurrer they appealed.

*George E. Harris*, Attorney-General, for the State, filed a brief for the appellants, making the following points: —

1. The act of 1877 is but a proposition to the creditors, by which they are not affected unless they accept it. As it could not bar their claims, they are not entitled to the injunction. This being the only question involving the complainant's interest, his remedy is complete at law, and there is no reason to invoke the aid of equity.

2. The legislature has entire control of the matter of taxation. If vested rights had accrued by contract, and the legislature had no power to repeal the law imposing the tax, the remedy of the complainant would be by *mandamus*, and not in equity. A court of equity will not interfere where the complainant's remedy is clear and unembarrassed at law. *Shotwell* v. *Lawson*, 30 Miss. 27; *Haynes* v. *Thompson*, 34 Miss. 17; *Echols* v. *Hammond*, 30 Miss. 177; *Boyd* v. *Swing*, 38 Miss. 182. If he shows a legal, instead of an equitable title, he cannot have relief. *McAffee* v. *Lynch*, 26 Miss. 257. Where *mandamus* is the appropriate remedy, it cannot be substituted by bill in equity. 2 Dillon Municipal Corp. § 664; *Walkley* v. *Muscatine*, 6 Wall. 481. The act complained of is a general law, in which no person can have a vested right. *Coulson* v. *Harris*, 43 Miss. 740, 741.

3. There is no trust in the lands which can be thus enforced. If any one has a right to complain, it is the levee commissioners, whose lands are affected by the act. They are not objecting, but, on the contrary, are defendants to the bill. The case is novel, if we concede all that is claimed. The lands are assets of the levee board, which is solvent, so far as the bill shows. There exists the mere relation of debtor and creditor, with no attempt on the part of the latter to defeat the claim. The assets, under the circumstances, cannot be held for any particular creditor.

*J. B. H. Hemingway*, on the same side, made an oral argument, and filed a brief making the following points : —

1. No act of the levee commissioners, contemplated by the act of 1877, could so injure the appellee or other bond-holders as to be a ground for an injunction. There are four provisions in the act affecting the interests of the bond-holders. First, that they *may* present their bonds before June 1, 1877, and have them cancelled, and new ones issued on a basis of $33\frac{1}{3}$ per cent of the principal and interest of the old bonds. The constitutionality of this part of the act could, if necessary, be defended. It is a mere proposition on the part of the legislature, to be voluntarily accepted or rejected. A similar statute has been sustained by this court. *Vasser* v. *George*, 47 Miss. 715. But, in any view of the provision, the appellee cannot restrain the appellants from proposing a compromise, nor prevent such of the bond-holders as wish, from accepting it. The second provision bars from the benefits of the act bonds not presented by June 1, 1877, but allows them to be receivable for redemptions and sales of land. Prescribing a limitation in which creditors of ·the levee board may assert their claims, it partially bars those not established within the time. The principle is well settled that the legislature may prescribe the times and modes in which remedies shall be pursued, and bar suits not brought within such periods, or pursued in such modes. This is exercising a lawful power over the remedy, not violating the obligation of a contract. Story on the Constitution, § 1385 ; *Sturges* v. *Crowninshield*, 4 Wheat. 200, 206, 207 ; *Hawkins* v. *Barney's Lessee*, 5 Pet. 457. The statute does not, however, provide an absolute

bar; for it allows bonds not presented within the time to be used in redeeming and purchasing lands. The legislature did not go as far as it might. But if this provision were unconstitutional, it could not be made the basis of an injunction. The statute executes itself, and works the bar without the aid of the levee commissioners. As they are not required to do any thing, there is nothing to be enjoined. The third provision referred to levies a tax to pay the new bonds to be issued under this act. The levee commissioners cannot be enjoined on this provision, because they have nothing to do in regard to this tax but to receive it. The complainant will not be injured by their receiving the tax when offered, nor has he any right to object to their receiving it. Conceding the act of 1867 to be an inviolable contract, there is nothing in it to prevent the legislature from levying an additional tax on the lands in the levee district to pay the new bonds to be issued under the act of 1877. The fourth provision repeals the tax provided for in the act of 1867. As the levee commissioners have nothing to do with this provision, it is impossible to make an injunction based upon it operate against them.

2. The appellee calls upon the court to declare the act of 1877 unconstitutional. The statements of the bill do not present a case which requires the court to pass upon its validity; but the relief prayed may be granted, if the court should so consider, without testing the act. The lands claimed as trust property may be sold to pay the bonds held by the complainant and others; and the tax provided in the act of 1867 collected for the same purpose, by declaring the act of 1867 a contract enforceable in chancery without at all considering the act of 1877. If the object was to test the act of 1877, the bill should have presented a case in which the relief prayed could not be granted without declaring that act unconstitutional. No such case is presented. But the question as propounded in the bill is one of curiosity, and the answer if given will be voluntary. Cooley Const. Lim. 163.

3. One object of the bill is to enforce the collection of the taxes provided in the act of 1867. The complainant has certainly mistaken his remedy in this particular, if entitled to any. It is well settled that *mandamus* is the proper remedy for com-

pelling the performance of any duty by a public officer. High Extra. Rem. §§ 80, 81. And where the duty of collecting a tax is required of such officers, *mandamus* is the appropriate remedy to enforce its performance. High Extra. Rem. §§ 139, 143. Or, if the levee commissioners be regarded as a municipal corporation, still *mandamus* is the proper remedy to compel the collection of the taxes. Cooley's Const. Lim. 292; Dillon on Municipal Corporations, §§ 664–685; High Extra. Rem. § 369.

*J. A. Brown*, on the same side, argued the case orally, and filed a brief, citing, among others, the following authorities: —

1. On the power of the court to grant the relief asked. Acts 1858, p. 33 *et seq.*; Acts 1866–67, p. 243 *et seq.*; *Dartmouth College Case*, 4 Wheat. 659; *People* v. *Morris*, 13 Wend. 325; *Philadelphia* v. *Fox*, 64 Penn. St. 180; *Police Jury* v. *Shreveport*, 5 La. Ann. 665; 9 Gill & J. 365; *Darlington* v. *New York*, 31 N. Y. 193; *Richmond* v. *Richmond Railroad*, 21 Gratt. 610; 1 Coler on Municipal Bonds, 32; *Justices of Clarke* v. *Paris Turnpike Co.*, 11 B. Mon. 154'; *Walkley* v. *Muscatine*, 6 Wall. 483; Moses on Mandamus, 126 *et seq.*; *Mississippi* v. *Johnson*, 4 Wall. 500; *Police Jury* v. *Britton*, 15 Wall. 566; *Barkley* v. *Levee Commissioners*, 93 U. S. 265; *Rees* v. *Watertown*, 19 Wall. 107.

2. On the alleged trust in the lands. Acts, *ubi supra*; *Allen* v. *Montgomery*, 48 Miss. 107; *Arthur* v. *Bank*, 9 S. & M. 430; *Attorney-General* v. *Carmarthen*, Cooper's Eq. 30; *Colchester* v. *Lowten*, 1 Ves. & B. 226; *Richardson* v. *Inglesby*, 13 Rich. Eq. (S. C.) 101; Acts 1875, p. 11; *North Yarmouth* v. *Skillings*, 45 Me. 133; *Christ Church* v. *Philadelphia*, 24 How. (U. S.) 300.

3. On the alleged contract and the statutes said to impair its obligation. *Dartmouth College Case, ubi supra*; *Hunsaker* v. *Borden*, 5 Cal. 288; *State* v. *St. Louis*, 34 Mo. 567; *Gilman* v. *Sheboygan*, 2 Black, 513; *Musgrove* v. *Vicksburg Railroad*, 50 Miss. 683; *Swann* v. *Buck*, 40 Miss. 296; *Huntsman* v. *Randolph*, 3 Tenn. (Cooper's ed.) 263; *Coulson* v. *Harris*, 43 Miss. 740.

*W. L. Nugent*, for the appellee, argued the case orally.

*Nugent & McWillie*, on the same side.

1. The act of 1867, known as the Liquidating Levee Law, is a contract within the intent and meaning of the Constitution of the United States. The legislature may make such a contract; and, when fairly made, it is irrepealable. *Fletcher* v. *Peck*, 6 Cranch, 129; *New Jersey* v. *Wilson*, 7 Cranch, 164; Cooley Const. Lim. 281, 284. The word " contract " in the Constitution embraces all contracts executed or executory. *Sturges* v. *Crowninshield*, 4 Wheat. 197; *Dartmouth College Case*, 4 Wheat. 629. A State constitution is a law within the prohibition, *Railroad Co.* v. *McClure*, 10 Wall. 511; as is a statute, *Railway Co.* v. *Whitton*, 13 Wall. 270; or a judicial decision, under which the contract is made, *Chicago* v. *Sheldon*, 9 Wall. 50; *City* v. *Lawson*, 9 Wall. 478. When a statute has authorized a municipal corporation to issue bonds, and exercise the power of local taxation to pay them, and persons have bought the bonds, the power of taxation thus given is a contract. *Von Hoffman* v. *City of Quincy*, 4 Wall. 535. Swamp-land purchased under a State statute exempting it from taxation cannot afterwards be taxed. *McGee* v. *Mathis*, 4 Wall. 143. The question in this case is decided in *Vasser* v. *George*, 47 Miss. 715.

2. What was the obligation of the contract? The law itself, which entered into and became part of it. *Walker* v. *Whitehead*, 16 Wall. 314; *Olcott* v. *Supervisors*, 16 Wall. 678; *Lessley* v. *Phipps*, 49 Miss. 799. Whenever such a statute is so modified as to impair substantial rights, the attempted modification is within the prohibition of the Constitution, and to that extent void. *White* v. *Hart*, 13 Wall. 646. Statutes which embarrass the remedy are within the prohibition. *Green* v. *Biddle*, 8 Wheat. 1; *Bronson* v. *Kinzie*, 1 How. (U. S.) 311; *Curran* v. *Arkansas*, 15 How. (U. S.) 319; *Freeman* v. *Howe*, 24 How. (U. S.) 460. It is not a question of degree. The obligation of the contract shall not be impaired at all. *Planters' Bank* v. *Sharp*, 6 How. (U. S.) 327.

*W. P. Harris*, on the same side, made an oral argument.

*Harris & George*, on the same side.

1. The act of 1867 possesses the recognized elements of an

inviolable contract, protected by the Constitution of the United States. There is no difference between a tax levied by an act of the legislature to pay bonds and a tax levied by authority derived from a legislative act. After the bonds are issued, the collection in the one case and the duty to levy and collect in the other are alike imperative. This is the current law in this country. No principle is more firmly established in our jurisprudence, and authority is not needed for its support. We cite two cases, which indicate sufficiently the state of the law. *Von Hoffman* v. *Quincy*, 4 Wall. 535; *McGee* v. *Mathis*, 4 Wall. 143. In *Vasser* v. *George*, 47 Miss. 713, the act of 1867 is classed as a local law. But it is not material whether the act is local or general, private or public. If definite rights have been acquired under its provisions, they cannot be disturbed by the legislature.

The act of 1877, which is assailed by the bill in this case, reduces the tax levied by the act of 1867 one-half, not on the basis that it will, so reduced, be sufficient, but as a consequence of the repudiation of two-thirds of the bond debt. See § 8. It abolishes the tax levied under the act of 1867. § 11. It provides that, unless the bond-holders shall accept one-third of the amount due them, no tax shall be levied for their benefit. It is legislative confiscation. The whole act of 1877 must fall to the ground if the court shall determine, as it certainly will, that the act of 1867 must stand unaffected by it. The act is one scheme dependent on the repeal of that of 1867. The land forfeited to the levee commissioners and not redeemed occupies the same relation to the bonds as taxes collected. Both are pledged to the bond-holders. The lands cannot be withheld from sale or withdrawn from the operation of the act of 1867. They are as much part of a trust fund as the tax authorized by the act. The tax-payer who pays and does not allow his lands to be forfeited, is as much concerned to have the forfeited lands administered, so as to reduce the debt for which they stand pledged, as the bond-holder who wants his debt paid.

2. It was proper to enjoin the execution of the act of 1877. Every injunction against the doing of an act required to be done by an unconstitutional law is an injunction against its

execution. The only question is, not whether all or only part of the law is enjoined, but whether the party seeking to arrest its execution would be so far affected by the execution as to entitle him to ask such relief. The noted case of *Mississippi* v. *Johnson*, 4 Wall. 475, was a bill filed to enjoin the President of the United States from putting the reconstruction laws in force. The real ground of this decision was that, under the Constitution of the United States, the President is charged to see that the laws are faithfully executed, being not a mere ministerial functionary, but the chief executive of a nation, with a large discretion. But where the treasurer or other purely ministerial officer having the custody of a fund is directed by a void law to withhold it from the rightful owner, or to pay it over to one not entitled to it, or dispose of it in some manner which puts the whole fund at hazard, clearly the party rightfully entitled may obtain an injunction against such disposition.

The act of 1877 is directed against the bond-holders; the effect of permitting it to go into effect is to diminish the market value of the bonds, as surely as insolvency or bankruptcy would affect commercial credit. Again, if the law is allowed to take effect without challenge, at what point of time and in what way are the bond-holders to protect themselves? The act repeals the tax of 1867. The sheriffs would not collect it. There is no right in the bond-holder to proceed against the sheriffs; the power belongs alone to officers charged with the execution of the void law. The tax-payer will refuse to pay the tax of 1867. It is difficult to point out the way in which the bond-holder can obtain an adequate, speedy and effectual remedy for the great and inevitable injury which the enforcement of the act of 1877 will inflict. It is the peculiar virtue of the Court of Chancery, and of that court alone, to avert a threatened irreparable injury. The violation of the Constitution is flagrant. To arrest the execution of the act by preventing the initial step is complete redress. It can injure no one.

The rules established on this subject relate to the circumspection and caution with which courts should examine legislative acts before pronouncing them void, and not so much to

the kind of case in which the judicial power may be invoked. The question is asked, Why not allow those who are willing to cut down their bonds to do so? This presents a specious but false view. Of course, if they desire it, they may burn their bonds; but when they accept the act of 1877, the acceptance carries the tax of two and a half and one and a half with it, and there is then a state of things never contemplated by the legislature, and from which that body would have shrunk. It certainly is no objection to an injunction against action by the auditor and treasurer, which must in its nature affect the value of the bonds, and embarrass the remedy of the bond-holders, that people ought to be allowed to give up two-thirds of their demands, if they see fit.

CHALMERS, J., delivered the opinion of the court.

The act of Feb. 13, 1867, was a legislative proposition to the holders of claims against the old levee board of 1858, by which they were asked to submit to heavy sacrifices on the debts due them, and to accept in lieu thereof the new bonds to be issued under said act. For the extinguishment of these new bonds a specific tax of five cents per acre in some of the counties, and of three cents per acre in others, was levied upon all the lands in the levee district; which tax, it was declared, " shall continue until a sufficient sum is collected, with which to pay off all the debts and liabilities contracted or assumed, and all the script or evidences of debt issued by the general board of levee commissioners, organized under the act approved December 2, 1858." The taxes to be raised under this scheme went into the hands of a board of commissioners for the purpose of liquidating the new bonds authorized to be issued in extinguishment of the old debts. All lands which might be sold in future for non-payment of the specific tax imposed by the act became the property of the commissioners, for the like purpose of paying the new bonds. The holders of the old claims against the levee board of 1858, with singular unanimity, availed themselves of the invitation extended by the act, surrendered their evidences of debts long past due, which bore interest at the rate of eight per cent per annum, and upon which the accumulations of interest amounted to more than

fifty per cent upon the face of their demands. They received in lieu of them new bonds, for the face of their claims only, bearing five per cent interest, and due at intervals of from one to five years.

If any thing is settled in American law, the act of 1867 became a contract between the State of Mississippi and the authorities of the levee district on the one hand and the holders of the new bonds on the other, which it was not competent for either party thereafter materially to modify without the consent of the other. This immunity from change would not extend to mere matters of detail, even though one party or the other might construe modifications made as more or less favorable or unfavorable to their respective rights; and the presumption would always be in favor of the validity of such changes in the system as the legislature might from time to time adopt. But no fundamental alterations which affected the value of the security carved out for the bond-holder was permissible. It is manifest that the security in this case consisted of the tax which was fastened upon the land " until " (in the language of the act) " a sufficient sum is collected with which to pay off all the debts," and of the lands which should be forfeited to the commissioners for non-payment of the tax. The tax, and the lands forfeited thereunder, alike became a fund pledged by the act for the redemption of the new bonds; and it was thereafter no more competent for the legislature to repeal the tax or to divert the lands than it was for them in express terms to repudiate the bonds. Among the countless cases in support of this well-settled proposition we cite only two, which are strikingly illustrative of the principles upon which it rests. *Von Hoffman* v. *Quincy*, 4 Wall. 535 ; *McGee* v. *Mathis*, 4 Wall. 143. The doctrine deducible from these and other cases is that legislative contracts, like that embraced in the act of 1867, are inviolable, and that so long as the courts can find persons or machinery by which their obligations can be enforced, no measures will be left untried to compel performance.

It is true that cases have arisen, where, owing to peculiar facts and circumstances, it has been found impossible to administer relief; but this occurred solely because there were

no functionaries upon whom the courts could act, and because the judiciary has neither the power nor the machinery to levy and collect taxes. These cases, instead of being in conflict with, tend strongly to illustrate the general doctrine, and show that the interposition of the judicial arm will never be refused until it is conclusively shown to be powerless. Of this class are the cases of *Reese* v. *Watertown*, 19 Wall. 107, and *Barkley* v. *Levee Commissioners*, 93 U. S. 258.

The bill in this case, upon allegations which sufficiently show the necessity for the relief, seeks a subjection of the lands which have from time to time become forfeited to the levee commissioners. We think that the prayer should be granted, unless other reasons than those urged by the demurrer can be shown by answer. That the levee commissioners and their present successors, the auditor and State treasurer, are vested with power to sell the lands does not divest the Court of Chancery of its inherent jurisdiction to administer a trust fund for the benefit and upon the application of the *cestuis que trust*. In making the sales, the court can employ the services of the trustees designated by law, or of its own commissioner, as it may deem most advantageous to all concerned. It will proceed, as far as may be, in accordance with the provisions of the act of 1867 and of the several acts amendatory thereof, disregarding and treating as unwritten all acts and parts of acts which were intended or had the effect of withdrawing the lands from the ownership of the levee commissioners and their successors, and thereby defeating the claims of the bond-holders. It will not interfere, however, with lands which have been redeemed or bought with the bonds or other evidences of indebtedness intended to be protected by the acts of 1867 and subsequent acts. As to these, the advantages conferred upon the bond-holders, by making their bonds receivable in the purchase and redemption of the lands for all State and county taxes, and their consequent enhancement in value, may be considered as fairly offsetting any loss sustained by the abatement of a portion of the levee taxes due on the lands so redeemed or purchased.

The bill seeks further to enjoin the auditor and treasurer who have succeeded to the position and duties of the levee

commissioners from putting in execution the provisions of the act approved Feb. 1, 1877. This act, in several of its provisions, seems to be a flagrant violation òf those vested rights of the bond-holders which we have declared inviolable. It repeals the tax of five cents and three cents per acre, and substitutes therefor a tax of two and a half and one and a half cents respectively. It provides that all holders of levee bonds may surrender them by June 1, 1877, to the auditor and treasurer, and receive in lieu thereof new bonds for one-third the amount due on those surrendered. The old tax is wholly repealed, and those who fail to surrender their old bonds are denied all participation in the new tax. This seems to be a mere scheme to repudiate two-thirds of the bonds, and to reduce the rate of taxation in consequence of such repudiation ; but yet we cannot see that any duties devolved by the act upon the auditor and treasurer, the performance of which we are asked by the bill to enjoin, are so harmful to the complainant that he is entitled to arrest their execution. Those duties simply are to give notice through the public press of the passage of the act, to receive such old bonds as may be surrendered, and deliver new ones in lieu of them. They have nothing whatever to do with the imposition or collection of the new tax or the abolition of the old one. With them, it is true, the levee tax collectors (who are the sheriffs of the several counties in the levee district) must settle when the proper time arrives ; and it is possible, therefore, that they might be enjoined from giving the sheriffs acquittances in full until those officers have accounted for the full amounts due under the act of 1867 ; but the period for such settlements is distant. No such relief is contemplated by the bill, and hence we express no opinion upon the subject. It may be that *mandamus* would lie against the sheriffs to compel the collection of the old tax ; but this is a question also which we cannot decide in this proceeding. The fact that the complainant, who represents less than one-sixth of the bonded indebtedness, is unwilling to surrender his bonds and accept new ones, does not entitle him to enjoin other parties from doing so. The auditor and treasurer have no power either to compel or deny a surrender of the old bonds. They simply stand ready to receive

them from all who may offer, and to deliver the new ones in the place of such as may be surrendered. Whether they actually receive any or not must be indifferent to the complainant, if, as alleged by him, the whole law is unconstitutional. Neither an executive nor a ministerial officer can be enjoined generally from putting a law in force. *Mississippi* v. *Johnson*, 4 Wall. 475. The complainant who seeks an injunction must be able to specify some particular act, the performance of which will damnify him, and it is such act alone that he can restrain. This court has no power to examine an act of the legislature generally and declare it unconstitutional. The limit of our authority in this respect is to disregard, as in violation of the Constitution, any act or part of an act which stands in the way of the legal rights of a suitor before us; but a suitor who calls upon a Court of Chancery to arrest the performance of a duty imposed by the legislature upon a public officer, must show conclusively, not only that the act about to be performed is unconstitutional, but also that it will inflict a direct injury upon him. The complainant has failed to show this as to any of the things which the act of 1877 requires the auditor and treasurer to perform, and consequently the injunction was improvidently granted, and must be dissolved.

*Decree affirmed, and cause remanded for answer.*